LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians; Lac Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,

v.

STATE OF WISCONSIN, Wisconsin Natural Resources Board, Carroll D. Besadny, James Huntoon, and George Meyer, Defendants.

No. 74–C–313–C.

United States District Court, W.D. Wisconsin.

May 9, 1990.

Tracey Schwalbe, Hayward, Wis., for Lac Courte Oreilles.

Howard Bichler, St. Croix Tribal Council, Hertel, Wis., for St. Croix Chippewa Indians.

Joseph L. Young, Tribal Atty., Lac Du Flambeau Band, Lac Du Flambeau, Wis., for Lac Du Flambeau Band.

Earl Charlton, Milwaukee, Wis., for Mole Lake Band.

Milton Rosenberg, Madison, Wis., for Red Cliff Band.

David J. Siegler, Odanah, Wis., for Bad River Band.

James L. Beck, Wisconsin Judicare Inc., Wausau, Wis., for Wisconsin Judicare Incorp.

P. Scott Hassett, Madison, Wis., for amicus plaintiff.

Thomas L. Dosch, Asst. Atty. Gen., Philip Peterson, Asst. Atty. Gen., Madison, Wis., for State of Wis.

## OPINION and ORDER

CRABB, Chief Judge.

This case is before the court for a determination of certain disputed issues relating to plaintiffs' off-reservation hunting of white-tailed deer, fisher and other furbearing animals, and small game within the area of the state ceded to the United States by the plaintiff tribes. Deer hunting was the subject of a trial held in August 1989. The hunting of the other animals is the subject of stipulated facts submitted by the parties.

In this phase of the litigation, which has focused on the regulation of the harvesting of specific species, the parties have drafted separate regulatory codes governing the harvests. Plaintiffs' proposed code is set out in the Great Lakes Indian Fish and Wildlife Commission (GLIFWC) Model Off–Reservation Conservation Code; defendants' proposals are contained in Chapter NR 13 Wis.Admin.Code, Regulation of Chippewa Treaty Rights Participants. To a great extent the parties have been able to resolve the differences between the two proposals and have asked for judicial resolution of only a few matters. For example, they have resolved all of the issues governing the harvesting of wild rice and many of the differences between them relating to the harvesting of walleye and muskellunge.

With respect to deer, the parties have also resolved many of the differences in their regulatory approaches. Plaintiffs acknowledge the biological soundness of the state's deer management program and agree that it should operate as the primary management program. They agree that state health regulations will be enforced against members of the plaintiff tribes until such time as the tribes adopt adequate regulations of their own. They will add certain state law provisions to their own regulations prohibiting the carrying of loaded and uncased firearms in vehicles, prohibiting hunting from, on, or across any public road, prohibiting hunting one-half

hour before sunrise and after sunset, prohibiting hunting unless the hunter is at least twelve years old and is accompanied by a parent or guardian, and requiring hunters born after January 1, 1977, to complete a hunter education and firearm safety course.

For their part, defendants recognize tribal representation on department committees established to manage deer in the ceded territory. They acknowledge the adequacy of the tribal court system and certain tribal regulations set out in the GLIFWC Model Off–Reservation Conservation Code, draft 5/30/89, provided each plaintiff tribe adopts regulations identical in scope and content to those in the model code. Also, defendants acknowledge plaintiffs' right to harvest deer for ceremonial or religious purposes and have reached a stipulation with plaintiffs concerning regulations to be adopted by plaintiffs governing such harvesting.

Prior to trial plaintiffs indicated that a dispute existed over their right to kill albino deer. However, defendants put in no evidence of any conservation or public safety reason for restricting the killing of albino deer, and have made no reference to the issue in their briefs or proposed findings of fact. I conclude it is not disputed and will not consider it in this opinion.

As to fisher, other furbearers and small game, the parties have stipulated to all of the material facts and have agreed on an enforcement scheme that recognizes plaintiffs' capability to enforce a code such as plaintiffs' Model Off–Reservation Conservation Code but acknowledges plaintiffs' present inability to provide exclusive enforcement of the code and the need for cooperative enforcement by agents of the State of Wisconsin Department of Natural Resources. Defendants agree that the plaintiffs' harvesting rights apply to all natural navigable lakes and to the beds of streams, rivers and flowages owned by the state or its political subdivisions, excluding the Wisconsin–Minnesota boundary waters and Lake Superior.

The parties agree that the Wisconsin Department of Natural Resources procedures for determining the harvestable number of fisher in each fisher management zone shall continue to be used to determine the harvest of fisher. Defendants agree to recognize a tribal representative as an official member of all committees advising the Department of Natural Resources Bureau of Wildlife Management on small game and small game range in the ceded territory. Plaintiffs have agreed to make a number of modifications in their Model Code regarding the hunting of furbearers and small game.

The only matters remaining in dispute as to deer are the following:

1. Whether there is a need for a judicially-determined allocation of the deer harvest between plaintiffs and non-Indian hunters, and if so, what that allocation should be;

2. Whether plaintiffs may exercise their harvesting rights on private lands within the ceded territory when they are hunting by consent of the landowner;

3. Whether defendants may prohibit plaintiffs from hunting deer during the summer;

4. Whether defendants may prohibit plaintiffs from hunting deer by gun or bow and arrow during the twenty-four hour period immediately preceding the opening of the state deer gun season; and

5. Whether defendants may prohibit plaintiffs from hunting deer at night with a flashlight.

With respect to fisher, other furbearers and small game, the only unresolved issues of law are

1. Whether there is a need for a judicially-determined allocation between Indians and non-Indians of the harvest of fisher and, if so, what that allocation should be;

2. Whether plaintiffs may exercise their treaty rights on private lands within the ceded territory when they are hunting by consent of the landowner;

3. Whether plaintiffs' harvesting rights entitle them to place traps on the beds of flowages and streams regardless of the private riparian's consent.

For the purpose of determining these disputed issues, I make the following findings of fact from the parties' stipulations of fact and from the evidence adduced at the trial on white-tailed deer.

## FACTS

### A. White–Tailed Deer

1. Biology of the deer resource

The ceded territory contains one species of deer: the white-tailed (*Odocoileus Virginianus*), which occupies continuously throughout the year approximately 79% of the ceded territory, or 19,075 square miles of the territory's 23,929 square miles. Its range consists of land that has permanent vegetative cover.

White-tailed deer can thrive in a wide variety of habitats. In summer, they range in fields, wetlands and brushy areas, relying on herbaceous vegetation as their primary food source and developing the fat reserves that are important to their winter survival. In spring, they feed on the succulent new growth of sprouting grasses and leaves. From permanent openings in the forest they obtain high-quality, easily digestible grasses and herbaceous vegetation in fall, spring and summer.

In winter, deer range in coniferous vegetation that provides thermal cover and woody browse. They return to their winter range as snow accumulates and tend to congregate in "yards" in dense coniferous stands during the winter months.

Male white-tailed deer produce antlers annually, beginning in their second year. The antlers grow under the skin through the spring and summer. The skin over the antlers, called the "velvet," dries off when the antlers are fully grown and sloughs off by early September.

The deer mating season begins in October and can last through December, with the peak occurring by mid-November. The young are born primarily in May and June. When newly-born, they are unable to move and they remain hidden while their mothers forage for food in order to provide milk. Within three to four days they are able to move around with the mothers, but their primary protection continues to be in remaining motionless, with the white dapples on their backs providing effective camouflage until fall when the fawns lose the dapples and take on the tawny color of adults.

The reproduction rates of white-tailed deer are a function of the breeding female's (doe's) nutrition and age. Maximum reproductive potential is reached between the ages of three and seven years. The number of fawns each doe produces is determined by habitat quality and the severity of the winter during gestation.

Deer weight and antler development are a function of the deer range condition, the age of the animal, and its genetic makeup.

Winter stress is the major cause of over-winter mortality to the white-tailed deer in the ceded territory. Snow restricts movement and cold drains energy reserves, resulting in direct mortality and decreased reproduction. Winter severity also increases intra-uterine mortality during the winter and neonatal mortality during the spring.

Mortality from predators is not a major factor in modern day Wisconsin because there are so few large (non-human) predators present in the state. Occasionally bobcat or coyote will prey on deer in the winter, and bear, bobcat and coyote will prey on the fawns in the late spring and summer. Neither disease nor parasites play any significant role in deer mortality.

In addition to hunting and winter mortality, deer deaths are caused by road kill, wounding loss, poaching, and hay mowing. In the 1987–88 fiscal year about 9,500 deer were killed by motor vehicles in the ceded territory. Wounding losses during hunting season account for some deaths; poaching accounts for more, although the exact amount can only be estimated.

The deer population in northern Wisconsin is generally healthy because of the adaptability and resilience of the species and the increase in preferred habitat as the result of the cutting of mature northern forests, the development of second and third growth timber stands, and habitat improvement.

2. Deer management systems

Wisconsin is divided into "deer management units," each of which is an area of one similar kind of habitat, with boundaries established along roads or rivers. Sixty-four of the units are in the ceded territory. Each differs in its capacity to support deer.

The Department of Natural Resources makes an annual estimate of deer abundance for each management unit and an estimate of fawn production is made for each summer observation zone, or group of management units. The number of deer in a particular management unit varies depending on the unit's habitat.

The number of deer per square mile supportable by the habitat in a particular unit is referred to as the unit's "carrying capacity." Wisconsin Department of Natural Resources wildlife managers set population goals at a percentage of a unit's carrying capacity, taking into account the long term average carrying capacity, which is determined by deer population response to habitat quality and past winters of varying severity. In the forested units, the population goals are usually set between 60 to 70% of carrying capacity. These goals are designed to minimize losses during severe winters, provide a harvestable surplus of deer, and provide a buffer to account for losses during severe winters.

The number of deer required to maintain the population at goal level is called the maximum sustained yield. It is 50 to 60% of carrying capacity. The maximum number of deer available for harvest is that number in excess of the maximum sustained yield.

Deer population goals set above the maximum sustained yield provide more deer available for viewing and hunting. Deer population goals set below the maximum sustained yield provide fewer deer for viewing and hunting, improve deer quality, and reduce crop depredations and deer-car collisions.

The population goal for the management units within the ceded territory is 355,085, an average of 18.6 deer per square mile of deer range. The major tool employed to reach the stated population goal for each management unit is the restriction on the number of antlerless deer (does and fawns) that may be killed in each unit. This is accomplished by establishing a quota, or ceiling, on the total number of those deer that can be removed from the unit's population without adverse impact on the population's ability to maintain itself. When deer abundance exceeds the population goal, the antlerless quota is set high to curtail population growth or to reduce population levels. By imposing limits on the number of antlerless deer that can be harvested, deer managers need not limit the number of antlered deer that can be harvested during a late November deer gun season. These limits are placed only on gun hunters. The Department of Natural Resources sets no quota of any kind on bow hunters.

Antlerless deer harvest quotas need to be established annually, taking into account the current overwinter deer density estimate with the established population goal and projecting the fall status of the herd based on winter severity and recruitment estimates. Ultimately a harvest quota must be established so as to bring the deer population in line with the overwinter goal.

In order to determine the impact of deer harvest on population, the actual harvest in each management unit must be ascertained. The best means of doing this is by requiring the registration of each deer harvested so that its age and sex can be recorded, as well as the date of kill and the location of harvest by deer management unit and county. Age classes are determined at select registration stations. Once these determinations are made for each management unit at the completion of the hunting season, a population estimate can be made for each unit.

To meet deer population goals, seasonal restrictions on deer harvest are required, including a prohibition on any hunting at all when deer are in their winter yards after December 31, when hunting activity may place additional energy stress on the deer and increase their winter mortality. In addition, hunting should be prohibited

when bucks are without antlers and hunters cannot distinguish between bucks and does. Hunting of does should be prohibited until late August when most fawns are weaned, because the fawns will die if their mothers are killed while they are nursing.

### 3. Hunting Areas

Of the 23,929 square miles in the ceded territory, 7,800 are public lands. Public lands include land currently held in fee title by federal, state, city, town or county governments, and those lands held under the forest crop or managed forest programs pursuant to Wis.Stat. ch. 77, to the extent they are required to be open to public hunting and fishing. It is likely that the total square miles of public lands will increase in the future, because the Department of Natural Resources has a policy of land acquisition.

Deer management units 3, 5, 29B and 34 are units used regularly by tribal members for hunting. These units contain more public than private land. Units 3 and 5 both contain 60.8% public land; unit 29B contains 63.8% and unit 34 contains 53.3%. Together, these four units contain over 890 square miles of public land available for tribal deer hunting. The proximity of these units to the plaintiffs' reservations is shown in the map below:

**Deer Management Units**

☐ Chippewa reservations

▬ ▬ Lands ceded by treaty with the Chippewa

1) Red Cliff Band
2) Bad River Band
3) Lac du Flambeau Band
4) Lac Courte Oreilles Band
5) St. Croix Band
6) Mole Lake Band

In deer management units 3, 5, 29B and 34, plaintiffs have indicated their intent to take more deer than the NR 13 quota would permit, as shown in the following table.

| UNIT | 1989 TRIBAL DECLARATION | NR 13 QUOTA |
|---|---|---|
| 3 | 300 | 148 |
| 5 | 400 | 142 |
| 29b | 50 | 35 |
| 34 | 125 | 107 |

Historically, Chippewa hunting locations often changed because of population migrations or the opportunities of individual hunters to meet the demands of the fur trade.

### 4. Harvest

Over the past five years, defendants have worked with plaintiffs' tribal governments and with GLIFWC in determining antlerless deer quotas in the ceded territo-

ry. During this time, plaintiffs' members have not harvested their entire tribal quota for antlerless deer. Plaintiff tribal members harvested 476 deer in 1984, 945 deer in 1985, 1530 deer in 1986, 2099 in 1987 and 2468 deer in 1988. However, in 1987 plaintiffs harvested within 20% of their antlerless deer quota in 16 management units and harvested 71% of their overall quota. In 1988 they harvested within 20% of their antlerless deer quota in 14 management units and harvested 66% of their overall quota.

Under defendants' proposal for allocating the deer quota, plaintiffs are entitled to many more deer than they are capable of harvesting. For example, if in 1988 the parties had been operating under Wis.Admin.Code § NR 13.32(2)(f), plaintiffs would have been entitled to a tribal deer quota of 11,421. In 1989 the quota would have been 14,572. Plaintiffs advised defendants they intended to harvest 4,786 deer in 1989. Their actual harvest for the year was not determined at the time of trial.

In 1988, state licensed hunters harvested a total of 121,740 deer in the ceded territory. Bow hunters took 7,722 antlered deer and 7,893 antlerless deer; gun hunters took 53,553 antlered deer and 52,572 antlerless deer.

The deer resource is limited in terms of preserving an adequate population to reproduce a harvestable surplus for the following hunting season. The deer resource is also subject to competing demands by user groups. Access and harvest quotas must be designed to insure the continued survival of the species and use of the resource by Indians and non-Indians.

5. Seasons and Hunting Hours

Under the Model Off-Reservation Conservation Code drafted by GLIFWC, members of the plaintiff tribes would be permitted to hunt antlered deer from July 1 until December 31; to hunt antlerless deer from September 1 until December 31; and, during a "Middle Season," coinciding with the state deer gun season, would be required to wear blaze orange and wear a back tag furnished by the tribe.

Under Wis.Admin.Code NR 13, members of the plaintiff tribes would hunt as they have during the past five years. Section NR 13.32(2)(e) codifies the agreement the Department of Natural Resources has reached with the plaintiffs each year since 1984: the season for tribal hunting of both antlered and antlerless deer would begin on the day after Labor Day, continue through the Thursday preceding the nine-day state gun deer hunting season, resume on the Saturday preceding Thanksgiving and continue until December 31.

During the day immediately preceding the state deer gun hunting season, the public woods in the ceded territory are usually crowded with non-Indian hunters looking for hunting areas, deer trails, places where deer may be present, and locations for tree stands. In view of the number of people on public land in the ceded territory during the twenty-four hour period immediately preceding the state deer gun hunting season, permitting tribal hunters to hunt for deer during this period presents safety concerns. It also presents problems in preventing non-Indians from getting an illegally early start on hunting, because of the difficulties of distinguishing between tribal hunters hunting legally and non-Indians hunting illegally.

There is no biological reason to prohibit the harvest of antlered deer during the months of July, August and early September.

Wis.Admin.Code §§ NR 10.04 and 10.-01(3)(h) permit summer hunting of coyote and unprotected wild animals such as skunk and weasel. Although the number of tribal deer hunters who wish to hunt in summer is considerably smaller than the number of persons licensed to hunt these animals, it is much larger than the number of small game hunters who actually do hunt in the summer. Coyotes and other fur-bearing animals are generally hunted in the fall when their pelts are prime, using low caliber ammunition to avoid any unnecessary damage to the pelt. Unprotected animals killed for nuisance control are not usually "hunted," but are killed in close range of residences with low caliber rifles

or shotguns with fine shot. Also, it is usual to "shine" or "bait" these animals and shoot them at short range, rather than from a distance, as with deer.

State law permits hunting during July, August and early September of snowshoe hare, opossum, skunk, weasel, starlings, English sparrows, coturnix quail, chukar partridge and other unprotected species. State law does not restrict the caliber of weapon that a state-licensed hunter may use to hunt these species. Some state-licensed hunters use high caliber weapons to shoot at and kill coyotes and fox during the summer months.

In 1987, 1690 individuals were permitted to hunt bear in Wisconsin during a period in which foliage remained on the trees.

When state small game seasons start in middle September, the foliage has not yet started to drop.

6. Hunting weapons and safety

Hunters of small game usually use .22 caliber rifles or shotguns loaded with fine shot. A .22 caliber bullet can travel a mile or more. Shot can travel 500 yards or more.

Deer hunters usually use high-powered high caliber rifles, such as the .30–.06 and .30–.30, and single slug shotguns such as a 12 gauge. A .30–.06 has a maximum range of two and one-half to three miles; a .30–.30 has a maximum range of two miles. A 410 single slug has a maximum range of over 800 yards. The effective killing range for a 12 gauge shotgun loaded with a single slug shot is 100 yards or less.

Although the power of a rifle bullet decreases with distance travelled, bullets from .30–30 and .30–.06 deer hunting rifles still have over 1200 foot pounds of energy at 100 yards, and at this distance are approximately twenty times more powerful than the smaller caliber bullets from rifles used typically for small game and predator hunting. Bullets having approximately 1000 foot pounds of energy can cause fatal injury to persons.

Bullets from .30–.30 and .30–.06 rifles will travel hundreds of yards through light brush before they lose their energy. Such bullets can even travel through a deer and retain enough energy to cause damage to persons behind the deer.

The modern compound bow used for hunting deer has approximately the same killing power as a deer rifle. The arrow has a broadhead consisting of two or more razor sharp blades that kill by causing hemorrhaging.

Buckshot sized 00 can travel 610 yards and has an effective killing distance of 50–70 yards.

Seventy percent of all two-person hunter accidents occur at distances of less than 100 yards from muzzle to wound.

During the summer months, the greater part of the ceded territory is heavily populated with persons engaged in recreation: bikers, campers, hikers, swimmers, bird watchers, persons fishing, etc. In some areas, the recreational use of the public land increases tenfold during June, July, and August. Many of the people engaged in recreation use the same areas in which plaintiffs' members wish to harvest deer. After the Labor Day weekend the recreational use of public land decreases significantly.

From approximately May 15 until the first week in October summer foliage is in full bloom and constitutes an obstruction to hunters attempting to see a target and beyond. The dappled lighting effect in the woods during the summer months adds to the difficulty of distinguishing the hunting target and what lies behind it.

Plaintiffs' safety expert, Eugene Defoe, Chief Warden for GLIFWC, agrees that deer hunting during the summer months poses safety problems. GLIFWC's former chief warden, Charles Connors, takes the same view. Both men confirm that tribal hunting during the day preceding the beginning of the state deer gun season poses a danger to the many hunters in the area preparing to begin the hunt.

7. Shining Deer

Under the GLIFWC Model Code, §§ 3.14 and 6.20, tribal members would be permitted to shine deer on foot using a flashlight from September 1 through December 31, except during the state's nine-day deer gun season.

Wis.Admin.Code § NR 13.30(1)(q) prohibits shining deer (illuminating them with artificial light) when a hunter is in possession of a firearm or bow. The code permits shining raccoon, fox, coyote, opossum, skunk, weasel, starlings, English sparrow, coturnix quail, chukar partridge, snowshoe hare, and other unprotected species. (In 1987, 360,942 individuals possessed state licenses allowing them to hunt these animals at night.) These animals are generally shot with lower caliber bullets that travel shorter distances than the bullets used for deer hunting, and wholly different hunting practices are used. Many of these species are usually shot when they are treed, and the light is used to illuminate the animal in the tree, rather than to cause it to freeze, as with a deer. A bullet that misses a target in a tree will usually travel straight upward and fall harmlessly to the ground, rather than traveling straight out into the area behind the tree. By contrast, a hunter shining a deer would shoot at it from approximately the same plane, so that if the hunter missed, the bullet or arrow would travel into the background area where it might damage persons or property that the hunter cannot see. Even if the hunter hits the deer, the bullet may travel through the deer and do damage to persons or property behind the deer. Such shooting violates a fundamental precept of hunting: that the hunter be able to identify his or her target and what lies beyond it before firing a shot or loosing an arrow.

Shining deer is an effective means of locating and killing them. Deer are nocturnal, their eyes reflect artificial light, and they tend to freeze in place when a light is focused directly into their eyes. Most other animals do not respond to light in a similar manner.

There is no biological reason not to hunt antlered deer with the aid of artificial light. However, killing a doe during the summer could cause the loss of the fawn that is still dependent on her for food. Plaintiffs concede that visibility is diminished at night, and have proposed in their code a ban on hunting by shining during the summer months when it is difficult to distinguish an antlerless deer from an antlered one.

### B. Fisher, Other Furbearing Animals and Small Game

The resources in this category include beaver, bobcat, cottontail rabbit, coyote, fisher, mink, muskrat, otter, snowshoe hare, raccoon, gray fox, red fox, gray squirrel, fox squirrel, red squirrel, sharp-tailed grouse, and ruffed grouse.

The beaver occupies streams, rivers and lakes with wooded shoreline. It gives birth in April to July to litters of two to four and dies naturally of severe weather, starvation and disease. Its estimated statewide population is 160,000, about 120,000 of which are in the ceded territory. In 1970 about 16,000 were harvested. The 1988–89 harvest estimate was 30,027.

Approximately 1,500 bobcat exist in Wisconsin, all within the ceded territory, generally in forested zones with lowland conifers. The bobcat mates in early spring and produces a litter of two to four kits approximately 62 days later. Little is known about its natural mortality. Approximately 200 are harvested each year.

The cottontail rabbit is considerably more abundant in Wisconsin. The ceded territory contains about 365,000, which is only about 8% of the state population. Its habitat preferences are diverse and it adapts well to urban and agricultural areas. It can produce three to four litters of between four to seven young each year. Predation, disease and winter deaths account for most natural mortality. The harvest in 1988–89 was 340,943, with less than 10% in the ceded territory.

The estimated state population of coyote is 14,000, of which about 10,400 are in the ceded territory. The coyote breeds in the early spring and produces five to ten young in April or May. It is a highly adaptable

animal that can use a wide range of habitats that support an adequate prey base. Disease is the main cause of natural mortality. The annual harvest averages 4,000, although the 1988–89 harvest estimate was only 971. About 80% of the harvest takes place in the ceded territory.

The most recent estimate of the state's fisher population is between 3,000 to 4,000, all of which is within the ceded territory. The fisher breeds in March or April and produces its young the following year. The average litter is three. Its habitat preference is dense stands of conifers, particularly lowland conifers, with adequate prey. Fisher suffer very little natural mortality other than kit predation and old age. The harvest averages 300 a year. The 1988–89 harvest was 260.

Approximately 60% of the state's estimated 161,000 wild mink live in the ceded territory, mainly on shorelines along lakes, marshes, streams and rivers in vegetative cover ranging from aquatic plants to brushy or woody species. Mink breed in early spring and have litters in April or May of between two to six young. Human-induced mortality is much greater than natural mortality. The 1988–89 harvest was 42,725; the average is 32,000.

The state's muskrat population is about 2 million, of which 640,000 live in the ceded territory in marshes and in the edges of ponds, lakes and streams where emergent and submerged vegetation provides food. Muskrat require water that is deep enough to prevent freezing in winter. They may have two to three litters of five to six young each year. Little is known about the causes of natural mortality. The average harvest is 795,000, with about 33% occurring in the ceded territory.

The most recent estimate of the otter population is 5,200, about 75% of which is in the ceded territory. The otter's habitat preference is the riparian zone adjacent to lakes, streams and other wetlands. An important component of the habitat is the availability of den sites. Otter young are born in litters of one to five in April or May. River otters have few natural enemies but may be susceptible to disease and environmental contaminants. The average harvest is about 1,100.

The ceded territory contains between three and eight million snowshoe hares, which live in young brushy woodlands and swamps. They have two to three litters of two to four young each year. Natural mortality causes are predation and disease. The 1988–89 harvest in the ceded territory was 89,000.

Raccoons prefer the southern portion of the state. Only about 24,000 of the state's estimated population of more than 500,000 live in the ceded territory, along streams and lakes near wooded areas. They breed once a year and give birth to litters of between two to seven young in April or May. They are susceptible to disease. The 1988–89 statewide harvest was 175,844.

The gray fox is only an insignificant presence in the ceded territory. The red fox is somewhat more numerous, with a mid–1970's population estimate of 15,000 in the ceded territory, 52,000 statewide. The red fox gives birth to one litter of between four to nine in March or April. It prefers a mixture of forest and open country for a habitat. The primary cause of natural mortality is disease. Twelve thousand were harvested in 1988–89 in the ceded territory.

Approximately 1.7 million gray and fox squirrels live in the ceded territory. The gray squirrel prefers hardwoods and conifer hardwoods for habitat; the fox, open country and hardwood woodlots. Both the gray and fox squirrel have two litters each year. The gray has an average litter of three to five; the fox, two to five. Approximately 250,000 of both kinds of squirrels were harvested in 1987–88 in the ceded territory.

The number of red squirrels in the ceded territory is unknown, as is the size of the harvest. The red squirrel prefers pine and spruce or mixed hardwood forest and swamps for habitat. It has two litters a year of about two to seven young.

Almost all of the state's approximately 10,000 sharp-tailed grouse live in the ceded

territory, in prairie brushland or in more open habitats such as old fields, large, open deercuts, and aspen. The birds breed in the spring and give birth to clutches of ten to fourteen. The harvest is approximately 800.

The ruffed grouse numbers about 2.3 million, 1.4 million of which are in the ceded territory. It nests in the spring and has a clutch of ten to twelve. Its habitat is aspen, oak, alder and upland brush. Its populations fluctuate cyclicly. The 1987–88 harvest was 165,000 in the ceded territory.

In the preceding five years the off-reservation harvest by the plaintiff tribes of fisher, otter and bobcat has been as shown below.

1984–1985: Fisher 0; Otter 4: Bobcat 9; all other species unknown.

1985–1986: Fisher 4; Otter 0; Bobcat 0; all other species unknown.

1986–1987: Fisher 11; Otter 1; Bobcat 0; Fox 6; Coyote 1; Beaver 84; Muskrat 195; Mink 8; Hare/Rabbit 296: Raccoon 27.

1987–1988: Fisher 72; Otter 27; Bobcat 0; all other species unknown.

1988–1989: Fisher 50; Otter 0: Bobcat 0: all other species unknown.

The market values of the furs of fisher, otter and bobcat vary greatly from year to year, as demonstrated in the table below, which shows the average pelt prices for these animals for the period 1984 through 1989.

| YEAR | BOBCAT | OTTER | FISHER |
|------|--------|-------|--------|
| 1984–1985: | $71.93 | $24.41 | – |
| 1985–1986: | 63.70 | 22.22 | 79.99 |
| 1986–1987: | 85.37 | 26.68 | 109.42 |
| 1987–1988: | 86.21 | 24.45 | 111.94 |
| 1988–1989: | 53.98 | 19.96 | 73.09 |

Fisher harvest in the ceded territory has been managed by zone. The specific geographic boundaries of the zones have developed over the last four years, as fisher have proliferated. Each zone is comprised of several deer management zones, as shown in the map below. [See map on page 1411.]

# FISHER MANAGEMENT ZONES - 1989

The only furbearing species the parties intend to subject to a quota is fisher. The 1989 total quota for fisher harvest in Zones A–D and the 1989 tribal quota for fisher by zone proposed by defendants in § NR 13.-32(2)(r)(2) are shown below, together with the actual 1987 tribal harvests in those zones.

| ZONE | STATE QUOTA | PERCENT PUBLIC | NR 13 QUOTA | 1987 HARVEST |
|---|---|---|---|---|
| A | 76 | 42 | 16 | 40 |
| B | 170 | 39 | 33 | 17 |
| C | 50 | 39 | 10 | 0 |
| D | 150 | 38 | 29 | 15 |

Plaintiffs have demonstrated that in some years in some management zones they are able to take more fisher than NR 13 would provide the tribes in that zone. They have not yet demonstrated an ability to take more fisher in the ceded territory on an annual basis than defendants' NR 13 allocation formula would provide if all management zones are considered together.

Harvesting the entire harvestable surplus of fisher in any fisher management zone from only the public lands within the zone would not create any biological problems for perpetuation of the species in the ceded territory. Harvesting the entire harvestable surplus of otter and bobcat in the ceded territory from only the public lands would not create any biological problems for the perpetuation of either species in the ceded territory.

If the treaty harvest of fisher, otter, bobcat and all other species at issue on this motion is limited to public lands, the treaty

harvest would be limited only by the tribes' interest and physical capacity to harvest and by any zonal and territory-wide limits on harvestable surplus. The parties possess no evidence at this time that foreclosing harvest from private lands creates a practical ceiling on the tribal harvest of these animals. The entire ceded territory or zonal quota or safe harvest of fisher, otter and bobcat could be harvested from the public lands alone without biological damage to the species.

It is reasonable to expect that fisher and bobcat populations and perhaps otter populations would be denser on public lands than on private lands in the ceded territory.

Commonly, furbearing animals are captured by trapping. The traps are placed directly on or anchored to the beds of water bodies, including natural navigable lakes, artificially created flowages, rivers and streams.

The amount of public lake and public stream frontage (not including managed forest lands or forest croplands) in the nineteen counties that lies entirely or nearly entirely within the ceded territory is shown below.

## PUBLIC LAKE AND STREAM FRONTAGE IN CEDED TERRITORY

| Counties All Within Ceded Territory | Total Lake Acres | Total Lake Frontage (miles) | Total Public Frontage (miles) | % Public | Total Stream Acres | Stream Frontage Both Sides (miles) | Total Public (miles) | % Public |
|---|---|---|---|---|---|---|---|---|
| Bayfield | 22,685 | 730 | 259 | 35.4 | 991 | 1,057 | 381 | 35.9 |
| Douglas | 14,012 | 365 | 97 | 26.6 | 8,153 | 1,411 | 527 | 37.4 |
| Ashland | 4,854 | 200 | 56 | 28 | 2,446 | 1,096 | 413 | 38 |
| Iron | 28,954 | 612 | 73 | 11.9 | 1,503 | 1,266 | 336 | 48 |
| Price | 14,623 | 420 | 80 | 19 | 3,377 | 1,374 | 432 | 31 |
| Rusk | 8,169 | 242 | 50 | 20.8 | 2,867 | 860 | 138 | 16 |
| Sawyer | 55,253 | 945 | 131 | 14 | 3,106 | 1,193 | 501 | 42 |
| Taylor | 6,116 | 168 | 68 | 10 | 1,248 | 988 | 192 | 19 |
| Barron | 17,265 | 426 | 38 | 8.8 | 1,184 | 732 | 29 | 4 |
| Burnett | 31,518 | 589 | 61 | 10 | 2,625 | 665 | 190 | 29 |
| Polk | 20,168 | 453 | 15 | 3.2 | 1,726 | 694 | 62 | 8.9 |
| Washburn | 30,201 | 862 | 209 | 24 | 1,561 | 662 | 271 | 41 |
| Chippewa | 19,335 | 459 | 77 | 16.7 | 1,702 | 762 | 80 | 10.4 |
| Forest | 22,324 | 427 | 166 | 38.8 | 1,770 | 1,420 | 795 | 56 |
| Oneida | 69,874 | 1,331 | 173 | 13 | 3,982 | 1,661 | 350 | 21 |
| Vilas | 92,232 | 1,499 | 352 | 23.5 | 1,274 | 804 | 344 | 43 |
| Langlade | 8,864 | 381 | 109 | 29 | 1,832 | 1,026 | 299 | 29 |
| Lincoln | 12,172 | 416 | 91 | 22 | 2,620 | 1,337 | 218 | 16 |
| Marathon (>95%) | 26,303 | 379 | 97 | 25.5 | 3,748 | 1,911 | 101 | 5.3 |
| Totals | 504,922 | 10,904 | 2,202 | 20.2 | 47,715 | 20,919 | 5,659 | 27.1 |

Additional amounts of public lake and stream frontage within the ceded territory are found in counties that lie only partially within the ceded territory.

There are approximately 11,238 lakes within the ceded territory. Approximately 10,760 of these are natural navigable lakes.

If the treaty harvest of aquatic fur bearers (beaver, otter, muskrat and mink) were limited to natural navigable lakes, publicly owned shores and beds of flowages and publicly owned banks and beds of streams in the ceded territory, the treaty harvest of these animals would be limited only by the tribes' interest and physical capacity to harvest and by territory-wide limits on harvestable surplus. The parties possess no evidence at this time that prohibiting the placement of traps on the beds of streams or flowages where the riparians are private owners would create a practical ceiling on the tribal harvest of these animals.

Unlike the harvesting of deer, the underharvest of any of the furbearing and small game animals is not expected to cause any biological or management problem in the ceded territory. There is no biological or management need to take the quota or harvestable surplus of these animals from either public or private lands.

The law enforcement personnel of the plaintiff tribes are trained and are competent to provide effective enforcement of a code such as the GLIFWC Model Off–Reservation Conservation Code. However, at the present, they are not able to provide exclusive enforcement of the code. Plaintiffs have authorized the enforcement personnel of the Department of Natural Resources to enforce the provisions of each plaintiff tribe's Off–Reservation Conservation Code.

Each plaintiff tribe has competent and responsible leadership able to promulgate and apply tribal off-reservation harvesting regulations, through the enactment of relevant tribal ordinances and codes. Each plaintiff tribe has issued and requires photograph identification cards for those members who harvest natural resources off-reservation pursuant to tribal authorization. Each plaintiff has established a tribal court with jurisdiction to adjudicate alleged violations by a tribal member of his or her tribe's off-reservation harvesting regulations. Each of the tribal courts is capable of adjudicating alleged violations of a code such as the Model Off–Reservation Conservation Code in a fair, uniform and diligent manner. Such adjudicatory capability is adequate to ensure effective enforcement of the provisions of the codes.

## OPINION

### A. Allocation

■ At each stage of the district court proceedings in this case the court has been asked to make a specific apportionment of the natural resources that are the subject of plaintiffs' harvesting rights. In the first phase of the litigation it was the plaintiffs that raised the issue. They did not ask the court to apportion fixed shares of the harvest but sought a declaration of their entitlement "to the natural resources in the ceded territory to the extent required to provide them with a livelihood or moderate living." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 653 F.Supp. 1420, 1433 (W.D. Wis.1987) (*LCO III*). In support of their request, plaintiffs cited *Washington v.*

*Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (*Fishing Vessel*), in which the United States Supreme Court upheld with slight modifications the federal district court's determination that certain Indian tribes were entitled to 50% of the anadromous fish passing through their recognized tribal fishing grounds in the state of Washington under treaties executed in 1854 and 1855.

Noting that "[a]llocation has arisen in the Washington fishing rights cases in modern times in light of the scarcity of resources, such as steelhead and salmon, and because of the intense demand by Indians and non-Indians alike for those resources," Judge Doyle denied plaintiffs' request for a legal declaration of their right to the resources at issue in this case, on the ground that the predicate for allocating a fixed share of the resources had not yet been shown: "Neither party has presented evidence that any particular species is endangered in the ceded territory." *LCO III*, 653 F.Supp. at 1434. He added that "[t]he Washington allocation cases differ from this case in significant respects: (1) no finding has been made here of the scarcities of resources; (2) the language of the Chippewa treaties is different." *Id.*

In this second, regulatory phase of the litigation, it is defendants that have asserted repeatedly the need for a judicial declaration of a legal basis for allocation of the resources. As plaintiffs did in the earlier phase, defendants cite *Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055, for the proposition that judicially determined allocation is mandated when two groups share the right to harvest natural resources. Defendants argue that the court should make an equal division of the resources, the apportionment that was approved in *Fishing Vessel*.

At the initial trial in the regulatory phase, plaintiffs succeeded in showing that even if the tribes could exploit every harvestable natural resource in the ceded territory, they would not derive sufficient income from those resources to provide their members with a moderate standard of living. *Lac Courte Oreilles Band of Lake*

*Superior Chippewa Indians v. State of Wisconsin,* 686 F.Supp. 226 (W.D.Wis.1988) (*LCO V*). From this, plaintiffs argued that they were entitled to all of the resources, because the 1837 and 1842 treaties guaranteed them "that level of hunting, fishing, and gathering ... necessary to provide them a moderate living ..." *LCO III,* 653 F.Supp. at 1426. Defendants disputed plaintiffs' need for all the resources, and argued that whatever those needs, plaintiffs had no entitlement to the entire harvest. Defendants pointed out that the court had held that the treaties did not give plaintiffs an exclusive harvesting right and they argued that the applicable case law mandated the placement of a ceiling of 50% on plaintiffs' rights to the available harvest. Although defendants had good reasons for securing a judicial determination of plaintiffs' share of the harvest in order to reduce the uncertainties of the state's management task, I declined to make such a determination at that time. I held that "[t]he standard of a modest living [did] not provide a practical way to determine the plaintiffs' share of the harvest potential," and that defendants had not shown that plaintiffs' harvesting was endangering any species. *LCO V,* 686 F.Supp. at 233.

I denied defendants' request for a permanent allocation again at the conclusion of the walleye and muskellunge subphase of the litigation. Defendants had not yet shown the scarcity of a resource that would provide the predicate for making an allocation, and defendants' proposals for allocation were not sufficiently precise to permit a determination of the issue at that time. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 707 F.Supp. 1034, 1058 (W.D. Wis.1989) (*LCO Walleye*).

Although all of the disputed species (walleye, muskellunge, white-tailed deer, fisher and timber) have now been the subject of trials or stipulations of fact, there has been no showing yet that plaintiffs' harvest of any species is endangering the survival of that species. In fact, there has been no showing that plaintiffs' harvest is approaching even half the total available harvest of any species. The reality is that plaintiffs' share of the harvest of the most desirable species is only a fraction of the non-Indian harvest. For example, in 1989, the Indian spearing harvest from 102 lakes was reported to be 16,394 walleye; the non-Indian angling harvest, about 672,000 walleye from more than 800 lakes. Wisconsin State Journal, *Cultures in Conflict* (compilation of articles published from Dec. 10, 1989–April 8, 1990), p. 16 (1990). The 1988 Indian deer harvest was 2468; the non-Indian deer harvest was 121,740. The 1988–89 Indian harvest of fisher was 50, of a total harvest of 260.

Nevertheless, the cumulative weight of the evidence adduced by the parties during the regulatory phase is that there is heavy competition in the ceded territory for the most desirable species. For example, the non-Indian hunting demand for antlerless deer exceeds the available supply. In this sense, deer hunting is unlike non-Indian angling for walleye, which is essentially self-regulating, and it is like the salmon and trout fishing that was at issue in the Washington cases.

The showing of heavy competition establishes the predicate for addressing the issue of allocation. The full development of the factual record makes it possible to do so. Therefore, despite the fact that the species at issue in this case are different in significant respects from those considered in the State of Washington cases, as are the harvesting methods and the demands placed on the resources, and despite the fact that there is no showing that any resource is in danger, I will address the issue of allocation, or apportionment, of the resources.

Although I have declined earlier requests to decide the matter of allocation, I have agreed with the parties that it would have to be addressed during the course of this litigation. The need to do so has been implicit throughout this phase of the litigation. Using plaintiffs' harvesting capacity as a cap on their harvest share was workable as a temporary measure, given the modest dimensions of that capacity. It is not a workable long-term resolution. Plaintiffs' capabilities will not remain stat-

ic. They are bound to increase substantially as more of their members utilize their newly reconfirmed harvesting opportunities.

In addressing allocation, the starting point is the treaties from which the parties derive their claims to the harvestable resources. In 1837 and again in 1842, the United States entered into treaties with the Lake Superior Chippewa for cessions of land. The Chippewa ceded the land, reserving to themselves the right to exercise their hunting, fishing and gathering rights in the ceded territory. They did not reserve an exclusive right, but understood that they would be exercising their rights of hunting, fishing and gathering, and "other usual privileges of occupancy," *in common* with the "miners, loggers and soldiers who were settling in the territory." *United States v. Bouchard,* 464 F.Supp. 1316, 1338 (W.D.Wis.1978), *rev'd on other grounds sub nom. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341 (7th Cir.), *(LCO I),* cert. denied, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). It was the Indians' further understanding that "the presence of non-Indian settlers would not require the Chippewa to forego in any degree that level of hunting, fishing and gathering, and that level of trading necessary to provide them a moderate living ..." *LCO III,* 653 F.Supp. at 1426.

Neither the Indians nor the United States anticipated a time when the natural resources of the ceded territory would be scarce. However, that is what happened. The resources that were ample in the first half of the nineteenth century have become too scarce to satisfy present demands. Plaintiffs established in *LCO V* that even if plaintiffs were physically capable of harvesting all of the available resources in the entire ceded territory, free of competition from non-Indians, they could not meet their members' modest living needs from the natural resources.

This unexpected scarcity of resources makes it impossible to fulfill the tribes' understanding that they were guaranteed the permanent enjoyment of a moderate standard of living, whatever the harvesting competition from the non-Indians. It also makes it necessary to try to determine how the parties would have agreed to share the resources had they anticipated the need for doing so.

Plaintiffs argue that in interpreting the treaties the court must give primary recognition to plaintiffs' understanding that their moderate living needs would be guaranteed, even if those needs cannot be wholly satisfied now and even if the consequence is the elimination of all harvesting opportunities for non-Indians. This, they argue, is the essence of the agreement they made with the United States. They point to Judge Doyle's emphasis in *LCO III* on the Indians' understanding that the anticipated non-Indian settlement would not threaten their moderate standard of living.

> [The Chippewa] were aware that settlement by non-Indians had occurred and was occurring.... The Chippewa would be competing to some degree with the non-Indians for the kind of natural resources the Chippewa had been exploiting. This competition and accommodation would be on a scale which would not threaten in any degree the moderate living the Chippewa would continue to enjoy from the exercise of their usufructuary rights and their trading. This guarantee was permanent.... In the absence of a lawful removal order or in the absence of fresh agreement on the part of the Chippewa, the presence of non-Indian settlers would not require the Chippewa to forego in any degree that level of hunting, fishing, and gathering, and that level of trading necessary to provide them a moderate living off the land and from the waters in and abutting the ceded territory and throughout that territory.

> \*  \*  \*  \*  \*  \*

> [T]he Chippewa at treaty time did contemplate their subsistence and did understand that the usufructuary rights they reserved would be sufficient to provide them with a moderate living.

*LCO III,* 653 F.Supp. at 1426, 1434.

Plaintiffs concede that scarcity of harvesting opportunities may be a problem

now in a time of limited resources, but they contend it should not be solved by rewriting the treaties to give the Indians less than they understood they would receive. *Worcester v. Georgia*, 6 Pet. 515, 8 L.Ed. 483 (1832) (wording of treaties ratifying agreements with the Indians is not to be construed to their prejudice). *See also Morton v. Ruiz*, 415 U.S. 199, 236, 94 S.Ct. 1055, 1074–75, 39 L.Ed.2d 270 (1974); *Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, 1777 (1942).

Under plaintiffs' view, the court should allocate to the plaintiffs the primary right to all of the harvestable natural resources, leaving to the non-Indians the opportunity to take the portion that tribal members lack the capacity to take at this time. Although there is some force to this position, it does not give recognition to the other aspect of the treating parties' understanding: that there would be competition for harvesting opportunities. The consequence that it has become impossible to fulfill plaintiffs' understanding that they were guaranteed a modest living standard does not mean that the court can or should ignore plaintiffs' other understanding that there would be competition between the parties.

The parties did not intend that the Chippewa would retain an exclusive right to harvest the ceded territory's natural resources that could be exercised whenever it became necessary. Judge Doyle found explicitly to the contrary in *Bouchard*, 464 F.Supp. 1316. Yet an exclusive harvesting right is the logical result of giving primary consideration to plaintiffs' modest living needs.

Moreover, construing the treaties to give priority to plaintiffs' needs requires reading out of them both the Indians' understanding that they would be competing with the settlers for the natural resources and the government's expectation that it was acquiring both land and the normal incidents of land use for the non-Indian settlers.

I conclude that the parties did not intend that plaintiffs' reserved rights would en-title them to the full amount of the harvestable resources in the ceded territory, even if their modest living needs would otherwise require it. The non-Indians gained harvesting rights under those same treaties that must be recognized. The bargain between the parties included competition for the harvest.

How to quantify the bargained-for competition is a difficult question. The only reasonable and logical resolution is that the contending parties share the harvest equally.

In the Washington fishing rights cases, the courts struggled to explain why the anadromous fish resource should be shared equally between the treaty Indians and non-Indians. In the district court, the analysis rested heavily on the language in the treaties providing that the Indians' right of taking fish was held "in common" with the citizens of the territory. According to the court, it was likely that the treaty commissions used the term as it was used in contemporaneous dictionaries, as meaning " 'belonging equally to more than one, or to many indefinitely ...' " *United States v. Washington*, 384 F.Supp. 312, 356 (W.D.Wash.1974) (quoting Webster's American Language Dictionary of the English Language (1828 and 1862)).

On appeal, the Court of Appeals for the Ninth Circuit affirmed the district court's apportionment of approximately equal shares of the fish harvest, on the grounds that (1) such an apportionment reflects the equality existing between the two bargaining parties; (2) it "best effectuates what the Indian parties would have expected if a partition of fishing opportunities had been necessary at the time of the treaties"; (3) such an apportionment is within the broad equitable discretion of the district judge; and (4) it is supported by analogies to the property laws governing cotenancy.

A cotenant dissatisfied with his partner's exploitation of their common property may seek a partition of the property in order to protect his interest in it ... By analogy, the Indians are entitled to an equitable apportionment of the opportunity to fish in order to safeguard their

federal treaty rights.... The district court's apportionment does not purport to define property interests in the fish; fish in their natural state remain free of attached property interests until reduced to possession....

*United States v. Washington*, 520 F.2d 676, 687 (9th Cir.1975). In a related case, then Judge Kennedy found the cotenancy analogy unpersuasive, and of dubious relevance "even in an era when the supply of fish exceeded the demands of the fishing population." *Puget Sound Gillnetters Ass'n v. U.S. District Court*, 573 F.2d 1123, 1134 (9th Cir.1978) (Kennedy, J., concurring). In his view, the analogy was inadequate to resolve the conflict between treaty rights and the state's authority to conserve and allocate a fishery that could not sustain the full demands of all the parties. "A cotenant, absent acts of waste or ouster, has the right to possess and use the entire property ... [S]erious application of the analogy might permit a fishing group to take all the fish it has the capacity to catch, a result contrary to the one we affirmed in [*United States v. Washington*, 520 F.2d 676]." *Id.* at 1134-1135.

In the Supreme Court the district court's equal apportionment was approved with only slight modifications. *Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055. The Court concluded that an equitable measure of the common right of taking fish should begin with a division of the harvestable portion of each run into approximately equal Indian and non-Indian shares, with a downward reduction of the Indian share if tribal needs could be satisfied by a lesser amount. *Id.* at 685, 99 S.Ct. at 3074. Such a division was proper because it was consistent with earlier decisions concerning Indian treaty rights to scarce natural resources in which the Court had directed a trial judge or special master to devise an apportionment that assured that the Indians' reasonable livelihood needs would be met, *see, e.g.,* *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); it achieved the purpose of setting a ceiling on the Indians' apportionment "to prevent their needs

from exhausting the entire resource and thereby frustrating the treaty right of 'all [other] citizens of the Territory,'" and it was manifestly logical:

> For an equal division—especially between parties who presumptively treated with each other as equals—is suggested, if not necessarily dictated, by the word "common" as it appears in the treaties. Since the days of Solomon, such a division has been accepted as a fair apportionment of a common asset, and Anglo–American common law has presumed that division, when, as here, no other percentage is suggested by the language of the agreement or the surrounding circumstances.

*Fishing Vessel*, 443 U.S. at 686 n. 27, 99 S.Ct. at 3075 n. 27 (citations omitted). The court also noted that nineteenth century treaties with Great Britain dealing with fishing rights in waters off the United States and Canada used the term "in common with," and were interpreted by the Department of State as giving each signatory country an "equal" and apportionable share of the take of fish in the treaty areas. *Id.* at 676 n. 22, 99 S.Ct. at 3070 n. 22. In summary, the Court concluded, both sides had a treaty-secured right to take a fair share of the available fish. "This, we think, is what the parties to the treaty intended when they secured to the Indians the right of taking fish in common with other citizens." *Id.* at 685, 99 S.Ct. at 3074.

Throughout this litigation defendants have been arguing the applicability of *Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055, insofar as it stands for an equal distribution of harvest between Indian and non-Indian groups. I have resisted the suggestion because of my concern about the differences between the circumstances of this case and those in the state of Washington. Although I continue to believe that those differences are significant, I have become convinced that the approach taken by the Court in that case directs the basic approach that must be taken here: an equal division of the natural resources that are the subject of the treaty. That is the fair-

est result, and the inevitable one, whatever analysis is employed. As in *Fishing Vessel*, plaintiffs' needs for a moderate standard of living dictate their right to a full share of the harvest, subject to a ceiling set at 50% to prevent the frustration of the non-Indian treaty right.

Therefore, I will allocate the resources at issue here equally between the two groups, Indian and non-Indian.

Plaintiffs' moderate living needs drive the division. In the unlikely event that those needs decline to the point at which they can be met with less than half the harvest, the division will have to be adjusted to reflect the reduced needs.

The parties dispute whether apportionment is to apply to the entire territory or to each harvesting unit. Plaintiffs' position is that they should be permitted to take larger shares of the harvest in the lakes and management units closest to their reservations, rather than being required to diffuse their harvesting rights. Defendants argue that "[n]othing in the record even remotely suggests that at treaty time the Chippewa intended to reserve for themselves the exclusive right to harvest all the [resource] in a particular geographical area of the ceded territory." Defendants' Post–Trial Brief for the Third Subphase of Phase II, at p. 31. They add that giving plaintiffs the opportunity to harvest all of the harvestable deer or fisher in a particular unit would have the effect of excluding the non-Indians from any opportunity to share in the harvest in that unit.

In general, I agree with defendants that the apportionment of the harvest must apply in each harvesting area, rather than on a territory-wide basis. Otherwise, as defendants point out, the consequence would be pockets of exclusivity within the territory, in contravention of the parties' understanding that they would be competing for resources. (Because the Indians' harvesting seasons are longer than the non-Indians and open earlier, in some instances the Indians could harvest all of the safe harvest of a particular resource before the non-Indians had an opportunity to hunt or fish for that resource.)

What defendants have not addressed, however, is the other half of the position they assert. If the Indians did not anticipate having exclusive harvesting rights in any particular areas of the territory, they had no reason to anticipate that the non-Indians would have such rights. The court of appeals has held definitively that plaintiffs' right to exercise their usufructuary rights is limited to lands not privately owned. *LCO I,* 700 F.2d at 364 n. 14; *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 760 F.2d 177 (7th Cir.1985) (*LCO II*). (As used in this opinion, the term "private lands" refers to lands that are held privately and are not enrolled in the forest cropland or managed forest lands programs under Wis.Stat. ch. 77. Whether the term includes the beds of streams is taken up in Section F, *infra*.) As a result, large portions of each harvesting area are closed to Indian hunters because the lands are privately held. Defendants do not explain how the court can give content to the parties' understanding of the non-exclusivity of their rights without responding to the fact that non-Indian settlement has created enormous pockets of exclusivity.

Although plaintiffs are precluded from exercising their usufructuary rights on private lands, they cannot be denied their full share of the harvestable resources. Therefore, in calculating a treaty quota the parties must begin with the total of the estimated harvest of the scarce resource in the particular harvesting area, including the portion of the resource believed to inhabit private lands, and divide it equally. Plaintiffs' portion of the harvest in a particular harvesting area cannot be determined fairly by first deducting some part of the harvest from apportionment because it is assumed to inhabit private lands. To exclude a portion of the harvest from the apportionment would violate the parties' understanding of the treaties, and give the non-Indians the pockets of exclusivity defendants object to giving the Indians. If plaintiffs cannot utilize the resulting harvesting opportunity, the portions can be

adjusted to reflect the tribes' actual harvesting capacity.

It may be necessary at some times to give exclusive rights to one or the other group in some small, discrete harvesting areas in order to meet the goals of conservation and of fair distribution of the entire harvest. For example, plaintiffs are precluded from fishing by intensive methods such as spearing or netting on any lake that does not have a reliable population estimate, and from fishing intensively on any lake for more than two years in succession. As a result, in any given year, there will be many lakes closed to plaintiffs for conservation reasons. At some times it may be necessary to provide plaintiffs a larger share or all of the harvest of some of the lakes in which they can fish intensively, in order to adjust for the number of lakes that are closed to them. In addition, increases in the Indian share of the harvest on some lakes may be necessary to compensate for decreased harvesting opportunities on other lakes resulting from non-Indian harassment of the Indians who are exercising their reserved usufructuary rights.

With respect to deer, defendants' proposed Wis.Admin.Code § NR 13.32(2)(f) sets forth the maximum tribal quota for antlerless deer for each of the sixty-five deer management units within the ceded territory.

*Tribal deer quota.* 1. Maximum quota. Maximum tribal antlerless deer quotas for each management unit located within the ceded lands territory shall be based upon the following formula: state quota × public land (including forest crop and managed forest land open to public hunting) × 50%.

2. Actual quota. Tribal quota shall be established based on request of the Chippewa bands provided the requests are submitted to the department prior to June 15, subject to the maximum of subd. 1. Tribal request shall be based upon past harvest performance and capacity to harvest.

3. Minimum quota. Notwithstanding the formula of subd. 1, the minimum available quota for any management unit shall be twenty-five.

Under the state's proposal, the Department of Natural Resources will establish an annual harvest quota of antlerless deer for each unit, in consultation with the plaintiff tribes. The tribal quota for each unit will be fifty percent of the total harvest quota of antlerless deer calculated to be available on public land.

This proposal does not achieve an equitable allocation of the deer resource. It excludes deer assumed to be on private lands from the total available harvest, and thereby creates exclusive hunting opportunities for non-Indians. Therefore, defendants may not enforce this regulation unless and until it is redrafted to include in the Indian quota all of the harvestable deer in the ceded territory. Because the requirement that plaintiffs base their annual requests upon past harvest performance and capacity to harvest is a reasonable one, defendants are not precluded from making it a part of the redrafted regulation and from enforcing it.

With respect to fisher, defendants have proposed the following regulation for an Indian harvesting quota in § NR 13.-32(r)(2):

(b) Maximum tribal fisher quotas for each fisher management zone as established in § NR 10.01(4), located within the ceded lands territory shall be based upon the following formula: state quota × % public land (including forest crop land and managed forest land open to public hunting) × 50%

(c) Actual tribal fisher quotas shall be established based on requests of the Chippewa bands provided the requests are submitted to the department prior to August 15, subject to the maximum of subpar. b. Tribal requests shall be based upon past harvest performance and capacity to harvest.

As with deer, defendants' proposed regulation for the Indian fisher harvest quota is unenforceable because it excludes the Indians from a portion of the harvesting opportunity. Therefore, defendants may not enforce this regulation unless and until they

have redrafted it to delete the reference to public land in the quota. They may include in such redrafted regulation the requirement that plaintiffs base their annual requests for fisher upon past harvest performance and capacity to harvest and may enforce such a requirement.

### B. Private Lands

■ In § 6.15(2) of the Model Off–Reservation Conservation Code, plaintiffs have provided for tribal deer hunting on private lands whose owners have consented expressly to deer hunting by tribal members. In §§ 8.12 and 8.13, they have made the same provisions for hunting and trapping small game. It is their contention that tribal hunting on such lands should be governed by the Model Off-Reservation Code rather than by the state regulations applicable to non-treaty hunters.

Defendants disagree sharply with the assumption that plaintiffs' hunting rights extend to private lands under any circumstances. They view the issue of consent as legally gratuitous, recognizing on one hand that if the treaty right extends to private lands it is unnecessary for the tribes to secure the consent of the owners, and on the other, that if plaintiffs' rights do not extend to private lands the tribes cannot relieve themselves of the obligation to obey state hunting regulations simply by reaching an agreement with a property owner to hunt on private lands.

In *LCO III*, 653 F.Supp. at 1432, Judge Doyle held that

On lands privately owned, the Chippewa have lost their reserved usufructuary rights. However, if at a given time the Chippewa can show, in a lawsuit if necessary, that this diminution in their usufructuary rights is preventing them from enjoying a modest living, appropriate measures must be taken for Chippewa activity on privately owned lands to permit the Chippewa to enjoy a modest living.

Plaintiffs assert that the factual predicate has been met for making private lands available for tribal deer hunting because in the future there may be years in which some of the deer management units might not provide a full tribal harvest under the state's proposed allocation formula, and because at the present, at least in some deer management units and fisher zones, the plaintiffs' share of the "public" animals is fewer than the number plaintiffs have the capacity and the need to harvest. They add that they are not seeking at this time a declaration of their right to hunt on all private lands, only the acknowledgement of their right to hunt by consent on some private lands.

The two assertions are contradictory. If plaintiffs have a right to hunt on private lands, they cannot be limited to hunting on only those private lands whose owners consent. Defendants are correct in maintaining that the issue of consent is a red herring: the issue is whether plaintiffs may exercise their usufructuary rights on private lands within the ceded territory.

In my view, that opportunity is foreclosed to plaintiffs at the present time. The decisions of the court of appeals in *LCO I*, 700 F.2d 341, and *LCO II*, 760 F.2d 177, have established that plaintiffs' rights have been extinguished on private lands. I have held that plaintiffs are not entitled to all of the resources necessary to provide them with a moderate standard of living. Plaintiffs are entitled to an equal share of all of the resources within the ceded territory, but they may harvest those resources only from public lands. It may be in the future that they can prove not only that they have the need to take the full half of the resources to which they are entitled but that they have the capacity as well and that they cannot harvest their share without gaining access to private lands. In that event it may be necessary to take appropriate measures for Chippewa activity on privately owned lands, as Judge Doyle suggested. It may be that hunting by consent is one of those measures. I express no view on that point.

It is premature to reach the issue of private lands now. It is premature also to determine whether plaintiffs would have to establish that they are unable to harvest their full share from the entire territory or

merely that they are unable to harvest their quota in a particular harvesting unit. That is another question on which I express no view.

At the present time, therefore, plaintiffs' members have no more rights than non-Indian hunters to hunt or to trap on private lands. In other words, when tribal members are hunting or trapping on private lands they are subject to state hunting and trapping regulations.

### C. Summer Deer Hunting

In *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 668 F.Supp. 1233 (W.D.Wis. 1987), (*LCO IV*), I held that, under certain circumstances, the state could regulate the plaintiffs' usufructuary activities for the purpose of preserving a particular species or for protecting the state's citizens from certain public health and safety hazards. I appreciate the strength of the argument to the contrary, that is, that any state regulation of such rights violates the supremacy clause of the United States Constitution. *See, e.g.,* Note, *State Regulation of Lake Superior Chippewa Off–Reservation Usufructuary Rights,* 11 Hamline L.Rev. 153 (1988); Johnson, *The States Versus Indian Off–Reservation Fishing: A United States Supreme Court Error,* 47 Wash.L.Rev. 207 (1972). I appreciate also that the basis for state regulation has never been explained satisfactorily. However, the legitimacy of state regulation in this area is not open to reconsideration. The United States Supreme Court has ruled definitively in the Washington state fishing cases that states may regulate Indian fishing rights in certain limited circumstances. *See Puyallup Tribe v. Dep't of Game,* 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968) (*Puyallup I*) (fishing may be regulated by state in interest of conservation, "provided the regulation meets appropriate standards and does not discriminate against Indians"); *Washington Game Dep't v. Puyallup Tribe,* 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (*Puyallup II*) (total ban on commercial fishing for steelhead was not a reasonable and necessary conservation measure and it discriminated against the Indians). *See also Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). In addition, the United States Court of Appeals for the Seventh Circuit has indicated its approval of limited state regulation in this case: "We doubt that extinction of the species ... or a substantial detriment to the public safety is a reasonable adjunct to the rights reserved by the Indians." *LCO II,* 760 F.2d at 183.

The broad language used by the Court in the *Puyallup* cases defeats the argument that the differences between the treaties in the Washington cases and the ones at issue here lead to different conclusions, so that the state regulation that is permissible under the "in common" language of the Washington treaties is not permissible here, where there is no such language in the treaties. The Court held that although the Indians' fishing rights could not be qualified or conditioned by the state, the "time and manner of fishing ... necessary for the conservation of fish," were not defined or established by the treaty and were therefore within the reach of the "overriding police power of the State, expressed in nondiscriminatory measures for conserving fish resources ..." *Puyallup I,* 391 U.S. at 399, 88 S.Ct. at 1729. The Court added the explanation that "[t]he measure of the legal propriety of those kinds of conservation methods is ... distinct from the federal constitutional standard concerning the scope of the police power of a State." *Id.* at 402 n. 14, 88 S.Ct. at 1730 n. 14. In *Puyallup II,* the Court stated that, "Rights can be controlled by the need to preserve a species ... the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets." 414 U.S. at 49, 94 S.Ct. at 334. It is notable also that in *Antoine v. Washington,* 420 U.S. at 206, 95 S.Ct. at 951, the Court rejected the suggestion that the in common nature of the Indians' preserved rights permitted the state of Washington to regulate Indian hunting.

Therefore, I conclude as I have throughout this phase of the litigation that the state may regulate for the purposes of conservation or for public safety, but only

if it meets its burden of demonstrating the need for the particular proposed regulatory measure. The state must show, first, that a substantial hazard exists; second, that the particular measure sought to be enforced is necessary to the prevention of the safety hazard; third, that application of the particular regulation to the plaintiff tribes is necessary to effectuate the particular safety interest; fourth, that the regulation is the least restrictive alternative available to accomplish the public safety purpose; and fifth, that the regulation does not discriminatorily harm the Indians or discriminatorily favor non-Indian harvesters. *LCO IV*, 668 F.Supp. at 1239.

■ The state's prohibition on summer deer hunting meets these conditions. All hunting creates some safety hazard to humans, whatever the time of year and whatever kind of ammunition is used. Limited summer hunting with low caliber firearms is a tolerable risk, as is the use of high caliber firearms and compound hunting bows after Labor Day when the recreational use of the woods by nonhunters has diminished sharply. However, summer deer hunting creates a substantial, unacceptable safety hazard to humans because of the dangerousness of the ammunition or arrows used for deer hunting, the heavy summer foliage and dappled light that hinder vision, and the greatly increased number of persons using the woods during the summer.

Plaintiffs argue that the state has failed to show a substantial safety concern in summer deer hunting because it licenses hunters for summer hunting of small game without restricting the type of ammunition or firearm they can use. As I have found, however, few people hunt in summer, and those that do use low caliber rifles or shotguns. Persons who hunt for pelts use the smallest caliber they can in order to preserve the pelt, and they hunt primarily in the autumn when the pelt is at its best. Persons who hunt nuisance animals in the summer have an incentive to use shotguns to increase their chances of killing their target. Because lower caliber ammunition and shotgun shells have less energy than

high caliber bullets, they travel shorter distances and hit with less impact.

Plaintiffs contend that defendants have not met their burden of showing that an absolute ban on deer hunting in the summer is the least restrictive means of protecting the public from a substantial safety hazard. They argue that allowing bow hunting or 00 buckshot or both would not pose the same safety concerns because of the shorter distances that arrows and buckshot travel. Plaintiffs may be correct, although both buckshot and hunting arrows are potentially lethal to persons, albeit within shorter distances than high caliber rifles and guns. However, I have not considered plaintiffs' contention because it was raised for the first time at trial, in violation of the understanding on which the parties and the court have been relying for this phase of the litigation. The parties were to codify their proposals for regulation in advance so that the opposing biological and safety experts could evaluate them prior to trial. Once trial started, the codifications were to be considered fixed proposals. The court's role was only to decide whether the state had succeeded in showing that its proposal was necessary, not to propose an alternative regulation.

Plaintiffs argue that their proposal for the use of arrows or buckshot for summer deer hunting should not be viewed as a substitute proposal, only as evidence that defendants' proposal is overly broad for its purpose. As I have pointed out, however, plaintiffs have not given defendants an adequate opportunity to review the adequacy of the alternative proposal and to produce expert testimony. Plaintiffs did not produce any expert to testify that buckshot or bow deer hunting in the summer would be safe. Therefore, I can make no finding that an absolute prohibition on summer deer hunting is not the least restrictive means of protecting the safety of the persons in the ceded territory.

I conclude that prohibiting summer deer hunting altogether is necessary to protect persons in the north woods from the substantial safety hazard of hunters using high caliber rifles or guns or hunting bows.

Application of the prohibition to non-Indians only would not achieve the safety purpose. No less restrictive measure would achieve the same purpose. Finally, the measure does not discriminate between the Indians and non-treaty hunters. The prohibition on summer deer hunting is narrowly drawn and imposes a minimal infringement upon the plaintiffs' usufructuary rights. Therefore, defendants will not be enjoined from enforcing this prohibition, except insofar as plaintiffs amend their tribal codes to incorporate the same prohibition.

### D. Twenty-four Hour Closure Prior to State Deer Gun Hunt

■ It is a closer question whether plaintiffs' members should be prohibited from hunting deer during the twenty-four hours immediately preceding the opening of the state deer gun hunt. Defendants assert that the prohibition is necessary because of the tens of thousands of prospective deer hunters who are in the ceded territory during this period, setting up tree stands, looking for good hunting spots, and planning their hunt. (Presumably they cannot be required to wear blaze orange as they must during the hunting season because they are not subject to state regulation until they actually start hunting.) Of more significance to the state is the concern that premature, illegal hunting by non-Indians would be much more difficult to monitor if Indian hunting were permissible during this time.

As substantial as these concerns are, the effect of giving them recognition would be to infringe upon the Indians' hunting rights in order to accommodate concerns about the conduct of non-Indian hunters. Essentially, the state is asking that the Indians be kept from hunting because non-Indians might refuse to wear blaze orange if not required to or because non-Indians might not observe the state deer hunting season. I conclude that the twenty-four hour closure provision fails the fifth prong of the test, that a regulation not discriminatorily harm the Indians or discriminatorily favor the non-Indians. Defendants will be enjoined from enforcing this regulation.

### E. Shining

■ In contrast to the twenty-four hour closure rule, the state's prohibition on shining deer is a narrowly drawn, non-discriminatory restriction on plaintiffs' hunting rights that is necessary to protect the safety of persons in the ceded territory. It imposes a minimal infringement on plaintiffs' rights in comparison to the great danger night hunting presents to public safety.

As the testimony at trial established, night hunting with high caliber weapons poses significant risks. Hunters cannot see beyond their targets to know whether a campsite or home is nearby or whether there are people in the area. Yet the force and range of their ammunition or arrows is such that people or objects far away from the hunter can be killed or badly hurt. To release a high caliber bullet or an arrow capable of killing a deer without knowing exactly what is behind the intended target is an obvious violation of the most basic hunting rules.

As with summer hunting, plaintiffs suggest that shining could be safe under certain conditions, such as in a baited, preselected location with the hunter in a tree stand or other elevated location. These conditions are not codified in the Model Off–Reservation Conservation Code, and the state did not have an opportunity to respond to them in detail at trial. Plaintiffs presented no expert testimony to show that specifying the conditions for shining would meet the legitimate safety concerns of the state. Therefore, I cannot find that defendants' proposed prohibition on all shining of deer is not the least restrictive measure possible for protecting human safety.

I conclude that this proposal meets the test of reasonableness identified in *LCO IV*, 668 F.Supp. 1233. Therefore, defendants will be permitted to enforce this regulation, except insofar as plaintiffs incorporate the same prohibition into their own tribal codes.

*F.  Riparians' Interest in Law Suit*

■  Fed.R.Civ.P. 19(a)(2)(i) requires joinder of persons claiming interests relating to the subject of the action who are so situated that disposition of the action in their absence will impair or impede their ability to protect that interest.  Defendants contend that this court cannot determine plaintiffs' usufructuary right to trap aquatic fur bearers on stream beds and river bottoms to which private persons hold riparian rights unless these persons are joined as parties, because any determination of plaintiffs' trapping rights will affect the riparians' property rights, which defendants cannot represent.

Plaintiffs dispute the contention that the riparians must be joined in this action.  They argue that the riparians have never had anything more than a qualified ownership interest subject to the paramount title of the state; that the Wisconsin cases holding that riparians have an exclusive right to trap on their stream beds and river bottoms are no longer good law and would be repudiated by the state supreme court were it to reach the issue; and that even if the stream beds are found to be privately owned, they are not lands needed for white settlement, and therefore are not "private lands" as that term was used in *LCO I,* 700 F.2d 341.

In Wisconsin, the beds of natural navigable lakes are owned by the state.  *State v. Trudeau,* 139 Wis.2d 91, 101–102, 408 N.W.2d 337 (1987).  The beds of rivers, streams and artificial flowages are owned by the riparians, that is, the persons owning the "uplands" abutting the water.  *Doemel v. Jantz,* 180 Wis. 225, 193 N.W. 393 (1923).  In the case of streams and rivers, the riparian's ownership rights extend to the "thread" or geographical center of the stream or river.  *Chandos v. Mack,* 77 Wis. 573, 46 N.W. 803 (1890).  In the case of flowages, the owner of overflowed lands retains title to the lands.  *Haase v. Kingston Co-operative Creamery Ass'n,* 212 Wis. 585, 250 N.W. 444 (1933).

On non-navigable waters, the riparian's ownership right is absolute.  With respect to navigable waters, the owner's title is qualified by a public easement that gives members of the public the right of navigation with all its "incidents," which include bathing, hunting, fishing, and boating.  Ellis, Beuscher, Howard & DeBraal, *Water-Use Law and Administration in Wisconsin,* p. 45 (1970);  *Munninghoff v. Wisconsin Conservation Comm'n,* 255 Wis. 252, 259, 38 N.W.2d 712, 715 (1949).  The Supreme Court of Wisconsin has held that trapping is not an incident of navigation, but an incident of land use.  *Munninghoff,* at 259, 38 N.W.2d at 715.

*Munninghoff* came to the supreme court as a challenge to the state conservation commission's refusal to issue a license to a private riparian who wanted to operate a muskrat farm.  The court acknowledged that the state's police power was determinative:

"The state, under its police power and to carry out its trust, passed the statute in question.  So long as it affects the public the statute is reasonable and is not contrary to any provision of the federal or state constitutions."

*Id.* at 257, 38 N.W.2d at 715 (quoting *Krenz v. Nichols,* 197 Wis. 394, 402, 222 N.W. 300, 303 (1928)).  Rather than ground its holding solely on the state's police power, however, the court went on to hold that trapping was not an "incident of navigation":

The right to use the running water or the bed for float trapping is not included in the easement of navigation.  To float-trap in navigable water constitutes a trespass upon the submerged land for which the trespasser may be prosecuted by the owner of the soil and enjoined from using the public water for that purpose.

*Munninghoff,* 255 Wis. at 259–60, 38 N.W.2d at 716.

Plaintiffs maintain that *Munninghoff* is an aberration in the development of the law governing the use of the state's navigable waters, and that it has been overruled implicitly by later cases.  It is true that it is difficult to harmonize the holding in *Munninghoff* with other cases in which the state supreme court has affirmed the ex-

pansive and longstanding public right to fish and hunt in navigable rivers and streams whose banks are privately owned. *See, e.g., Willow River Club v. Wade,* 100 Wis. 86, 76 N.W. 273 (1898) (private fishing club could not preclude members of the public from fishing within the banks of the river to which the club held riparian rights); *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N.W. 816 (1914) (private hunting club that had riparian rights to navigable stream could not exclude persons who hunted from a boat poled along the bottom of the stream). One commentator has made the point that "the soundness of finding trapping to be an incident of land use, in the face of Wisconsin cases finding hunting within the public right to use navigable waters, is open to doubt as a matter of logic. Both activities are essentially the same ..." Waite, *Public Rights in Navigable Waters,* 1958 Wis.L.Rev. 335, 344.

Whatever defects *Munninghoff* might have, it has never been overruled or repudiated by the state supreme court. Nevertheless, plaintiffs argue that the case has no precedential value, in light of two subsequent cases, *Muench v. Public Service Comm'n,* 261 Wis. 492, 53 N.W.2d 514 (1952), and *Ashwaubenon v. Public Service Comm'n,* 22 Wis.2d 38, 125 N.W.2d 647 (1963). In *Muench,* the state supreme court held that the riparian's qualified title to the beds of navigable streams is " 'subject to all those public rights which were intended to be preserved for the enjoyment of the whole people by vesting the title to the beds of such streams in [the state] in trust for their use.' " 261 Wis. at 502, 53 N.W.2d at 517–18 (quoting *Franzini v. Layland,* 120 Wis. 72, 81, 97 N.W. 499, 502 (1903)). In *Ashwaubenon,* the court reversed a public service commission order denying the town's petition to establish a bulkhead line in the Fox River. The court did not refer to riparian rights as a basis for its decision, but recognized that riparians have only a qualified title in the stream bed, that the title of the state is paramount, and that the rights of all others are subject to revocation at the pleasure of the state. *Id.* 22 Wis.2d at 49, 125 Wis.2d at 653. From these two cases, plaintiffs ar-

gue, it is clear that the present day court would not hold that riparian owners of stream beds can exclude members of the public from using the streams for any purpose including trapping. Any distinction between owners of lake front property and owners of river and stream banks no longer exists. The property rights of both are subject to the paramount interests of the public trust.

I do not read *Ashwaubenon* as sweeping away the remaining rights of riparian owners of navigable rivers or eliminating any distinction between stream bed and lake bed riparians. Although the court reiterated its earlier holdings that riparians have only a qualified title to the stream beds, it concluded that the commission was wrong in arguing that *Muench v. Public Service Comm'n,* 261 Wis. 492, 53 N.W.2d 514, stands for the proposition "that any significant use of the riverbed by private riparians contravenes the sacred trust under which the navigable waters are held." Instead, the court held, "[A] riparian owner, with knowledge of his qualified title and his revocable rights under sec. 30.11, Stats. 1959, by dint of that very statute may enjoy the use of the riverbed up to the established bulkhead line." *Id.* 22 Wis.2d at 49, 125 N.W.2d at 653.

Neither *Ashwaubenon* nor *Muench* announces a new rule that would undercut the validity of the holding in *Munninghoff.* Riparians have always had qualified rights, subject to revocation. The fact is, whatever its defects, *Munninghoff* remains the law with respect to trapping rights. *See, e.g.,* Waite, *Public Rights in Navigable Waters,* 1958 Wis.L.Rev. at 342 (mooring traps for muskrats may be one use of a stream bed that remains outside the purposes of the public easement); *see also* Ellis, Beuscher, Howard and DeBraal, *Water–Use Law and Administration in Wisconsin,* p. 46: "[T]he state's title, if any, to the beds of navigable streams likewise is a qualified title, as the public may be excluded from making certain uses which have been held to be the exclusive right of the riparian owner" such as trapping, citing

*Munninghoff,* 255 Wis. at 259–60, 38 N.W.2d at 716.

So long as the state recognizes some property interest in the riparian owners of stream beds, a decision interpreting plaintiffs' usufructuary rights as applying to trapping on privately owned stream beds would require this court to redefine state property laws. As a general rule, this is not a task for federal courts. *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel,* 429 U.S. 363, 375, 97 S.Ct. 582, 589, 50 L.Ed.2d 550 (1977) (title and rights of riparian proprietors in soil below high water mark are governed by laws of states). *See also Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 484, 108 S.Ct. 791, 799, 98 L.Ed.2d 877 (1988):

> We see no reason to disturb the "general proposition [that] the law of real property is, under our Constitution, left to the individual States to develop and administer." *Hughes v. Washington,* 389 U.S. 290, 295 [88 S.Ct. 438, 441, 19 L.Ed.2d 530] (1967) (Stewart, J., concurring).

Despite plaintiffs' efforts to show that riparians do not have sufficient property interests to make them indispensable parties in this subphase of the litigation, I conclude that a decision in plaintiffs' favor would alter the riparians' property rights with respect to the use of their stream and flowage beds, and that this interest makes the riparians indispensable parties. The riparians' interest may be only a qualified one, but it does not follow that it is not protectible.

Plaintiffs assert that the riparians' ownership rights in the stream beds are so attenuated by the public trust doctrine that it cannot be said that the lands are needed for non-Indian settlement. This assertion rests on their argument that the riparians' "bundle of property rights" has been reduced so far as to be insignificant. I disagree. I conclude that, with respect to trapping only, privately owned stream beds, river bottoms and overflowed lands are private lands within the meaning of *LCO I,* until such time as the Wisconsin courts should find that the owners cannot exclude members of the public from trapping in these areas. Whether these and other private lands may be needed at some time in the future to permit the plaintiffs access to their full share of the harvest is a question I do not reach at this time.

## ORDER

IT IS ORDERED that

1) Defendants are enjoined from interfering in the regulation of plaintiffs' hunting and trapping on public lands within the ceded territory in Wisconsin, except insofar as plaintiffs have agreed to such regulation by stipulation and except as herein ordered;

2) Defendants' request for a judicial declaration of the parties' rights to harvest the natural resources in the ceded territory is GRANTED; all of the harvestable natural resources in the ceded territory are DECLARED to be apportioned equally between the plaintiffs and the non-Indians, with such apportionment applying to each species and to each harvesting unit with limited exceptions as set forth in this opinion; and upon the condition that no portion of the harvestable resources may be exempted from the apportionable harvest;

3) Defendants are enjoined from enforcing those portions of § NR 13.32(2)(f) and § NR 13.32(r)(2)(b) that include a percentage of "public land" as an element of the formulas for determining the maximum tribal antlerless deer quota (in NR 13.32(2)(f)) or the maximum tribal fisher quota (in NR 13.32(r)(2)(b));

4) Plaintiffs may not exercise their usufructuary rights of hunting or trapping on private lands, that is, those lands that are held privately and are not enrolled in the forest cropland or managed forest lands programs under Wis.Stat. ch. 77; plaintiffs are subject to state hunting and trapping regulations when hunting or trapping on private lands;

5) Defendants may enforce the prohibition on summer deer hunting contained in their proposed § NR 13.32(2)(e), until such time as plaintiff tribes adopt a regulation prohibiting all deer hunting before Labor Day;

6) Defendants are prohibited from enforcing that portion of their proposed § NR 13.32(2)(e) that bars tribal deer hunting during the twenty-four hour period immediately preceding the opening of the state deer gun period established in § NR 10.01(3)(e); and

7) Defendants may enforce the prohibition on shining of deer contained in their proposed § NR 13.30(1)(q), until such time as the plaintiff tribes adopt regulations identical in scope and content to § NR 13.30(1)(q).

FURTHER, IT IS ORDERED that the stipulations entered into by the parties relating to the enforcement of harvesting regulations for and the management of white-tailed deer, furbearers, and small game are incorporated into this order.

Judgment affirmed, 907 F.2d 775.